IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**SETH A. LASHLEY**,                                                    Civil Case No. 09-193-KI

               Plaintiff,

                                            OPINION AND ORDER

   vs.

**COMMISSIONER** of Social Security,

               Defendant.


      Tim Wilborn
      Wilborn Law Office, P.C.
      P. O. Box 2768
      Oregon City, Oregon  97045

             Attorney for Plaintiff

      Dwight C. Holton
      Interim United States Attorney
      District of Oregon

Adrian L. Brown
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204-2902

Michael S. Howard
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, Washington  98104-7075

       Attorneys for Defendant

KING, Judge:

Plaintiff Seth Lashley brings this action pursuant to section 205(g) of the Social Security

Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for supplemental security income benefits ("SSI").

I reverse the decision of the Commissioner.

## BACKGROUND

Plaintiff filed an application for SSI on March 23, 2006, alleging an onset date of

disability of August 15, 2001.[1]  The application was denied initially and upon reconsideration.

After a timely request for a hearing, plaintiff, represented by counsel, appeared and testified

before an Administrative Law Judge ("ALJ") on March 19, 2008.

On May 9, 2008, the ALJ issued a decision finding that plaintiff was not disabled within

the meaning of the Act and therefore not entitled to benefits.  This decision became the final

---

[1]The ALJ's opinion inaccurately indicates that plaintiff reported an onset date of August
1, 2006.  Tr. 10.

Page 2 - OPINION AND ORDER

decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on December 11, 2008.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920. First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the Commissioner proceeds

Page 3 - OPINION AND ORDER

to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work which he performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial

evidence and is based on correct legal standards.  Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1

(9th Cir. 2005).  Substantial evidence is more than a "mere scintilla" of the evidence but less than

a preponderance.  Id.  "[T]he commissioner's findings are upheld if supported by inferences

reasonably drawn from the record, and if evidence exists to support more than one rational

interpretation, we must defer to the Commissioner's decision."  Batson v. Barnhart, 359 F.3d

1190, 1193 (9th Cir. 2003) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ concluded plaintiff has the following severe impairments:  bipolar affective

disorder, alcohol dependence, and panic disorder without agoraphobia.  However, the ALJ did

not find that these impairments met or medically equaled the requirements of any of the

impairments listed in Appendix 1, Subpart P of part 404 of the Social Security Regulations.

The ALJ found plaintiff has the residual functional capacity ("RFC") to understand,

remember, and carry out simple, routine tasks and instructions, but that plaintiff should avoid

contact with the general public.  Additionally, although plaintiff should avoid one-on-one contact

with co-workers, the ALJ concluded plaintiff is capable of working near his co-workers without

becoming distracted or distracting others.

The ALJ opined that plaintiff can perform his past relevant work as a lot attendant and

sorter.

**FACTS**

Plaintiff, born in August of 1972, alleges disability beginning August 15, 2001 due to bipolar disorder, attention deficit disorder, and panic disorder.  Plaintiff graduated from high school.  He has worked in the past picking bad beets off the line, detailing cars, stocking items at Value Village, and receiving donations at Goodwill.

The medical record goes back to 2003, with one lone record from 1996, but plaintiff's mother testified that plaintiff started showing signs of mental illness in his early teens.  Plaintiff also reported to Christine Golden, M.D., in 2004, that he had always suffered from anxiety and depression, even before he started drinking, and that he had felt suicidal as a child.

Plaintiff told Dr. Golden that he had his first drink of alcohol when he was six years old, and began drinking heavily in his late teens.  He continued drinking heavily into adulthood, but went through a detox program in September of 2002 and a rehabilitation program in 2003.  It was in 2002 that he saw a counselor for the first time because he and his then-wife were having marital problems.

Plaintiff's wife left him in 2003, taking their two children with her.  As a result, plaintiff became profoundly depressed and suicidal.  Dr. Golden reported that the September 2004 hospitalization was the seventh admission of plaintiff for suicidal depression in the Bay Area Hospital Psychiatric Unit.  Before that, he had been hospitalized in California in July 2003 and twice in Idaho in November 2003.  As of the September 2004 hospitalization, plaintiff had attempted suicide twice.  He was subsequently hospitalized in December 2004 at the Providence St. Vincent Medical Center for depression and suicidal ideation.  He was hospitalized there again in May 2005 after attempting suicide.  He was hospitalized there again for suicidal ideation in

August 2005 and October 2005.  He was transferred from Providence to OHSU in October 2005 for persistent suicidal ideation.  He was hospitalized again in February 2006 at Providence St. Vincent for suicidal ideation.

Plaintiff has attempted and failed many treatment programs.  In addition to the two times he attempted rehabilitation while he was still married, he went to the Bay Area First Step in January 2004, Klamath Falls Residential Alcohol Treatment Program in June 2004, De Paul Residential Chemical Dependency Treatment Program beginning October 2004 until he had "had enough" and left in February 2005 (Tr. 448), received treatment through the Tigard Recovery Center from February 2005 through October 2005, and lived at Oxford House in 2005.

Although this previous history is pertinent, plaintiff filed his SSI application on March 23, 2006, so he must prove he was disabled as of the filing date of his application.

Plaintiff received treatment at Coos County Mental Health from March 16, 2006 through March of 2007.  Joanne Rutland, PMHNP, treated him while he was a patient there.  She diagnosed bipolar disorder, alcohol dependence, and anxiety disorder.

Plaintiff spent a month in a crisis residential bed at Coos Bay, after being brought into Lower Umpqua Hospital by police as a suicide risk in September 2006.  Plaintiff reported he had tried to overdose on methamphetamine, alcohol and marijuana the previous week, but became sick instead.  He had been living in a transitional house called Step One.  After a month at the crisis residential center, he was transferred to an in-house substance abuse program at Crossroads Treatment Program around November of 2006.

Nurse Rutland opined on November 29, 2006:

There is no doubt that drug and alcohol usage does contribute to level of symptoms.  Although with that said, I do believe client clearly has a diagnosis of bipolar disorder, attention deficit disorder as well as panic disorder.  His history since 2002 has demonstrated repeatedly that even while clean and sober[,] client has had manic and depressive episodes to the severity of which has led to hospitalization.  Client is describing a commitment to remain clean and sober and does seem to understand the connection between relapse and mood symptoms.  When manic[,] client often develops psychotic symptoms.  He has some residual paranoia at baseline even when depressed.

Tr. 550.  Nurse Rutland believed plaintiff's mental illness kept him from working.  She also believed that he would be unable to maintain employment as his "condition is severe, chronic, and persistent."  Tr. 550.  She completed a Mental Residual Functional Capacity ("MRFC") form in which she identified plaintiff as having moderate and marked problems with social and work-related skills.

Nurse Rutland provided medication changes for plaintiff three times by telephone, while plaintiff was at Crossroads.  During his last contact with a provider at Coos County Mental Health, in March 2007, plaintiff reported that he felt like something was crawling on his skin, like he was being watched, he was not sleeping, and he was having racing thoughts and depression.

He attended therapy sessions at Douglas County Mental Health in January 2007.  He reported feeling fatigued and wanted medication changes made.  He agreed to attend the Dual Recovery Anonymous Education Class starting on January 22, 2007.  He reported he was cycling fast between manic and depressive states and was feeling angry and frustrated with the other patients at Crossroads, even though he was clean and sober.

During a February 14, 2007 session, plaintiff reported that the nurse at Crossroads had taken him off his medications without waiting for new prescriptions.  He reported a craving for alcohol because he knew that alcohol settled him down.  During several March 2007 sessions, he reported having thoughts of killing himself, and was feeling paranoid, depressed, and anxious.  He reported staying up all night to guard himself and his roommates from anyone who wanted to hurt them.  Although he had a few better weeks at the end of March, he described himself as too exhausted to get out of bed in early April.  His therapist, Rosemary Unterseher, ACSW, reported his extensive history of polysubstance abuse and that "[w]hen he feels better, he doesn't take his psychotropic medications and self medicates with drinking alcohol and using other drugs."  Tr. 643.  She also noted, "Because he has not been stabilized on his medications, he feels very uncomfortable and has trouble thinking.  He feels that a little alcohol will mellow him out.  He describes that meth also helps him clear his thinking."  Tr. 644.  Plaintiff was at Crossroads for five months and did not successfully complete the program.

He transferred to the Reedsport office of Douglas County Mental Health on April 9, 2007, when he moved in with his mother, and came under the care of Carol Embury, LCSW, a mental health specialist.  On May 4, 2007, he told Embury that his Clonazepam and Adderall had been stolen when he accidentally left them at a friend's house overnight.  Embury wrote him a prescription for three days, but was not comfortable with the situation.  On May 23, 2007, plaintiff told Embury he was all out of his medications, despite getting a two weeks' refill at the ER.  Embury denied plaintiff an Adderall prescription due to his abuse and his mother was drafted to dispense his Clonazepam.

Plaintiff was admitted to Bay Area Hospital after reports of his being intoxicated and chasing and scaring children in July 2007.  When he was apprehended, he told police he was going to kill himself by jumping in front of a car.  He told the emergency room personnel that he was well-controlled on his medications, but he had run out of Paxil and was getting worse.  He was admitted to Bay Area Hospital again in August 2007 after he was found lying in traffic.  He had stopped his medications and started drinking.

Plaintiff was released from the hospital on August 16, 2007.  Plaintiff's mother did not want him staying with her as he had destroyed property there.  Plaintiff was concerned he would use drugs if he did not have a place to stay.  Plaintiff started receiving injectable Haldol, which was helping him, he reported on August 20.

On August 29, 2007, he reported that he was feeling better and more stable than he had in a long time.  He planned to seek a referral to the De Paul Treatment Program.

In September 2007, he established care with Janet Patin, M.D.  He reported he had been sober for 28 days.  He had been going to AA meetings twice a week.  He was sleeping well.  Dr. Patin scheduled his haloperidol injections for every four weeks, refilled his Remeron, Haldol, and Cogentin.

In October 2007, plaintiff reported to Embury that he was hoping to get into De Paul within the next couple of months.  He thought he was doing well isolating himself in his mother's house.  He admitted to craving alcohol.

In November 2007, he reported to Dr. Patin that he was having trouble sleeping, thought about slitting his wrists every night, and was having panic attacks.  He admitted abusing Adderall

for his ADHD, but hoped his mother could dispense it for him. He could not sit still without it.

He spent most of the day lying in bed. He had stopped going to AA and church.

In late November 2007, he reported to Embury that he had relapsed twice. He had not

been coming for therapy appointments.

Embury closed plaintiff's file in December of 2007, since plaintiff had failed to come for

his last appointment. The closing note opined, "Client's primary problem is substance

abuse–when he is not using illegal drugs[,] he is med seeking prescription drugs. Client needs to

address those issues before he commits to MH treatment–assessing his MH needs is impossible

until he has addressed those issues and is committed to participating in treatment." Tr. 614.

## DISCUSSION

I.      Plaintiff's Testimony

Plaintiff argues that the ALJ improperly rejected his testimony. Plaintiff testified that the

things that kept him from working were his paranoia and anxiety; he thought people were talking

about him. As a result, he was unable to leave the house. He also testified that he had learning

disabilities, was forgetful, and had trouble getting along with others. He testified that he started

drinking when he ran out of his medications and explained that, "When I run out of my meds, I

don't do good at all. I try, I try to – I force myself to drink. I hate the taste of alcohol, but I know

it's going to make me feel better." Tr. 62.[2]

When deciding whether to accept the subjective symptom testimony of a claimant, the

ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective

_____

[2]One record implies plaintiff may enjoy the taste of beer, since he reported in a
questionnaire that he had been clean and sober for one month, but still drank three beers once a
week. Tr. 153.

medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9ᵗʰ Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  If there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony "only by offering specific, clear and convincing reasons for doing so."  Id.

The main reason the ALJ found plaintiff not fully credible was that, as the ALJ put it, plaintiff testified he did not know anything about the Douglas County Mental Health records from November 2006 through December 2007 in which plaintiff's drug-seeking behavior was documented.  Plaintiff contends the ALJ wrongly characterized plaintiff's testimony as a "denial of knowledge" of the counseling records.  Tr. 16.  Instead, plaintiff denied knowing the *contents* of the records because he had not seen them or read them.  The Commissioner, on the other hand, suggests the ALJ found plaintiff not credible as a result of plaintiff's lies about his substance abuse.

The ALJ specifically wrote:

At the hearing, the undersigned asked the claimant about the records from Douglas County Mental Health, which are included in the record.  **The claimant responded that he did not know anything about these records.**  These records detail treatment and counseling provided by Douglas County Mental Health from November 2006 through December 2007.  During this time, the claimant was seen at least once per month, and occasionally much more frequently based on the claimant's need for treatment.  **These records also detailed the claimant's use of controlled substances such as methamphetamine and marijuana, as well as documented the claimant's drug seeking behavior, that is found elsewhere in**

Page 12 - OPINION AND ORDER

**the record.**  The records state that the "client's primary problem is substance abuse – when not using illegal drugs he is med seeking prescription drugs.  Client needs to address those issues before he commits to MH treatment – addressing his MH needs is impossible until he has addressed those issues and is committed to participating in treatment."  Accordingly, **the claimant's denial of knowledge of these records is viewed as a fabrication and calls into question the claimant's credibility**, particular[ly] regarding the alleged severity of his impairment.  He had dealings with Douglas County Mental Health from November 1, 2006, until his case was closed, [on] January 4, 2007.  **The claimant's assertion that he knows nothing about these records is simply unbelievable.**

Tr. 16-17 (emphasis added).

The Commissioner is obviously incorrect–the ALJ disregarded plaintiff's testimony on the basis of plaintiff's purported lack of knowledge about the counseling records, not plaintiff's substance abuse and prescription medication seeking habits.

Plaintiff is right that he did not testify as to lack of knowledge of the records.  He says, instead, he testified to lack of knowledge about the *contents* of the records.  Plaintiff, too, is incorrect on this point.  Plaintiff testified as follows:

> Q:    Okay, they weren't real happy with you at Douglas County Mental Health over what they referred to as substance abuse.  Are you still drinking?
> A:    No, it's been over 140 days.
> Q:    Okay.  What about other drugs other than prescription drugs?
> A:    No.  None.
> Q:    Do you know why they got so crank[y] with you about all of that?
> A:    No, I don't.
> Q:    Okay.  Do you remember discussing it with anybody?
> A:    No, I don't.
> Q:    Okay.  One–the reason they closed your case is, is that they say you made minimal progress, and you, you really, you really weren't focused on your substance abuse problem.  And it says, when you're not using illegal drugs, you're medically seeking prescription drugs.  So, there's a question that comes up here as to what is actually going on.  All I can do is read the records.  Do you have any idea what they were talking about?
> A:    No, sir.
> Q:    None at all?
> A:    No.

Tr. 51.

It is apparent from this testimony that the ALJ was questioning plaintiff about his substance abuse issues and related medication seeking behavior, not about plaintiff's knowledge of the contents of the records or the existence of the records themselves. Nevertheless, I find for plaintiff in that the ALJ inaccurately summarized plaintiff's testimony.

I note, however, that although the ALJ inartfully described the issue in his opinion, it is plaintiff's denial of knowledge about his substance abuse problem that is the real credibility issue. See Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999) (inconsistent statements about claimant's drinking could be basis to find not credible). As the ALJ implied, it is "simply unbelievable" that plaintiff would have no memory about discussing his substance abuse issues when he told Embury he would attend NA meetings (Tr. 636), when Embury discussed her discomfort with giving a prescription when his medications were stolen (Tr. 634), when plaintiff told Embury he was afraid he would use drugs if he did not have a place to stay once released from the hospital (Tr. 629), when he signed a document listing one of his goals as "manage life without drugs" (Tr. 628), and when he listed "substance abuse" as a reason for not reaching his goals (Tr. 627). This is an issue for the ALJ to reconsider, which may require further hearing to more squarely put the questions to plaintiff about his history of substance abuse and prescription medication seeking habits.

Additionally, the ALJ noted that plaintiff's description of his limited activities cannot be attributed entirely to his mental impairments "in view of the medical evidence and other factors discussed in this decision." Tr.17. Plaintiff reported he spent most of the day in his mother's house "in order to avoid running into friends who encourage substance abuse. (Tr. 67.)" Pl's.

Page 14 - OPINION AND ORDER

Opening Br. at 18.  This statement seems to provide the best support for the ALJ's conclusion that plaintiff's self-imposed isolation was not due entirely to his mental illness.  Rather, he isolated himself so as to avoid temptation.  However, the ALJ certainly did not make this clear in his opinion.

Finally, the ALJ concluded plaintiff's daily activities could not be objectively verified.  The Commissioner seems to concede that this additional reason to question plaintiff's credibility was error, although he asserts it was harmless.

Since the ALJ failed to properly summarize plaintiff's testimony, his conclusion that plaintiff was not credible because "he did not know anything about these records" is not a clear and convincing reason supported by substantial evidence in the record.  Furthermore, the ALJ too vaguely phrased the only other reason supporting his credibility analysis–that plaintiff was not limited entirely due to his mental impairments.  As a result, the ALJ's credibility analysis was flawed.

II.     <u>Lay Testimony</u>

Plaintiff contends the ALJ improperly dismissed the testimony of plaintiff's mother and his nurse.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness.  A medical diagnosis, however, is beyond the competence of lay witnesses.  <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996).  A legitimate reason to discount lay testimony is that it conflicts with medical evidence.  <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001).

Page 15 - OPINION AND ORDER

A.      Plaintiff's Mother

Plaintiff's mother, Margaret Floran, testified about plaintiff's mental health when he was a young adult, about his current condition, about how his symptoms intensified when he stopped drinking, and the effect of his medications on his motivation.  She explained in a questionnaire, for example, that plaintiff failed to do chores, take care of himself, and isolated himself, even when he was sober.  She believed his suicide ideation was what led plaintiff to drink.

The ALJ concluded that Floran was a "less than reliable witness" due to the fact that she is on SSI for bipolar disorder, post traumatic stress disorder, and a personality disorder.  Tr. 18.  Additionally, the ALJ concluded that Floran's opinion was based on claimant's statements to her, which the ALJ previously gave little weight.

The Commissioner appears to concede that Floran's statements were based on her own observations not on the self-reports of plaintiff, contrary to the ALJ's findings, but argues this is harmless error because Floran's mental illness is a germane reason to question her credibility.

Neither the Commissioner nor the plaintiff provides any case law on the question of whether a witness' mental illness, standing alone, is a germane reason to find the testimony unreliable.  I have found no cases.  There is some evidence in the record as to Floran's mental condition.  She was an alcoholic for many years, but has been sober since 2000.  Tr. 606.  She either has multiple personality disorder (Tr. 358, 477, 643, 657) or borderline personality disorder (Tr. 76, 541), or both (Tr. 76).  One record reported that her condition was "greatly improved through years of psychotherapy."  Tr. 541.  Plaintiff testified that he does not need to care for his mother in any way.  The ALJ did not question Floran during the hearing about whether or how her condition affects her observations of plaintiff.

Page 16 - OPINION AND ORDER

It is clear from the record that plaintiff relies heavily on his mother; he lives with her, she dispenses his medications, she has taken him to the emergency room on multiple occasions when he was suicidal, she transported him to and from counseling sessions and attended some of them, she assisted plaintiff's attorney in identifying the location of relevant medical records, and providers described her as a support for plaintiff. None of plaintiff's providers mentioned that Floran was unstable or unreliable. Accordingly, I find that the ALJ failed to provide a germane reason to discredit Floran's testimony about her observations of plaintiff's current condition.

However, there is evidence in the record indicating that Floran may not be a reliable source of information with regard to plaintiff's history, such as when she first noticed plaintiff's mental illness. There is evidence in the record, for example, that not only was Floran an alcoholic, but she also had problems with marijuana and LSD (Tr. 478), and that plaintiff's grandmother helped to raise him (Tr. 260). As a result, it is possible that Floran's observations of plaintiff's mental condition at the time he was a child, as well as her memory of plaintiff's childhood, is unreliable. These were not, however, concerns the ALJ raised.

Absent any evidence that Floran's mental illness affected her observations of plaintiff's condition, the ALJ's finding that Floran is unreliable is error. Since the Commissioner concedes that Floran's testimony was based on her own observations, the ALJ's credibility analysis is not supported by substantial evidence.

B.    Nurse Practitioner Rutland

The ALJ also declined to rely on Nurse Rutland's opinion about the severity of plaintiff's mental impairments. The ALJ concluded Nurse Rutland "does not seem to understand the significance and effect of the claimant's alcohol abuse. It appears that Ms. Rutland has place[d]

a higher value on her own opinion, contrary to the significant weight of the evidence." Tr. 18.

Additionally, the ALJ concluded Nurse Rutland failed to provide "objective evidence to support

her conclusion." Id. The ALJ pointed to the "bulk of the medical evidence" showing

improvement when plaintiff remained sober. Id. He also noted plaintiff's statement that in 2002

plaintiff reported he was doing the best he ever had when he had stopped drinking. The ALJ

opined,

> When he ran out of medications, then he went back to drinking alcohol, and this
> cycle continued. It is clear from the record that the claimant is able to take his
> medications and control his psychiatric symptoms, but these symptoms are
> exacerbated when the claimant stops his medication and returns to drinking.

Id. The ALJ also refused to accept Nurse Rutland's opinion that plaintiff was "disabled" as she

was not familiar with the Social Security Administration's definition of the term and, in any

event, the determination is left to the Commissioner.

Contrary to the ALJ's finding, Nurse Rutland's opinion, that even when plaintiff is sober

he is unable to work because he experiences "manic episodes and paranoia," is amply supported

by objective evidence. Tr. 550. Medical records from Coos County Mental Health Department

in 2006, including Nurse Rutland's own clinical notes, are rife with plaintiff's complaints of

anxiety, depression, insomnia, and suicidal thoughts, all while sober, and his working history

demonstrates that he has been unable to keep a job for more than a few months.

Furthermore, I am not as certain as the ALJ is about what the "bulk of the medical

evidence" shows. There are certainly several records over the years that speak equally to the

notion that plaintiff's mental stability is questionable even when he is not drinking. For example,

plaintiff reported to Dr. Golden in 2004 that "[h]e began feeling depressed and suicidal as a boy

well before he ever started drinking." Tr. 257.  When plaintiff was hospitalized in December of 2004 for depression and suicidal thoughts, his alcoholism was in remission.  Tr. 282.  Plaintiff described alternating between depression and mania, and having paranoia and panic attacks, to Slater Tai, M.D., in June 2005.  At that time, plaintiff was living in sober housing at Oxford House and had remained sober, except when he drank eight beers two weeks before.

Additionally, when plaintiff was admitted to Providence in August of 2005, he reported that he had been sober for the last three months.  Although he had drunk two 20-ounce beers the day before, he complained of feeling depressed and suicidal for the past three weeks.  Tr. 403.  Similarly, in October 2005, when he was admitted to OHSU he told William Wilson, M.D., that he had been living at a dry house for eight months and that "[b]efore relapsing" on alcohol he had experienced difficulty sleeping, decreased interest, energy, and concentration, anorexia, and suicidal ideation.  Tr. 426.  Dr. Wilson noted that plaintiff's depression recurred "during a period of 8 months of sobriety.  Symptoms clearly preceded the eventual relapse into alcohol[.]"  Tr. 436.  In February of 2006, while living in Oxford House, which provides sober living, plaintiff reported to the ER complaining of suicidal ideation with fairly clear plans.  Tr. 461.  In August of 2007, Dennis Weimer, MD, at the Bay Area Hospital, diagnosed bipolar disorder that is "exacerbated by alcohol dependence[.]"  Tr. 592.

However, "where the evidence may reasonably support more than one interpretation, [I] may not substitute [my] judgment for that of the Commissioner."  Verduzco, 188 F.3d at 1089; Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) (ALJ may reject a lay witness' testimony if it conflicts with medical evidence).  It is true that other evidence in the record indicates that when plaintiff feels better, he stops his medications and starts drinking.  See Tr. 643, 511 ("clear

evidence in the record that claimant's multiple decompensations are clearly re[la]ted to relapsing/remitting alcohol use pattern.  Of note, when abstinent, he stabilizes and clears"), Tr. 513 (plaintiff reported boredom triggers alcohol cravings).  Plaintiff himself admitted that when he stops taking his medication he does not do well.  Furthermore, the vast majority of his hospitalizations were precipitated by plaintiff's intoxication.  See Tr. 240, 272 (stopped taking medications and lied to ER about being at the alcohol treatment center), 413, 423, 459, 587, 678. Indeed, plaintiff told one provider that he "gets crazy when he drinks."  Tr. 606.  Accordingly, although I am not sure the record is as clear as the ALJ suggests, the ALJ provided a germane reason to reject the opinion of Nurse Rutland.

Furthermore, I agree with the ALJ that Nurse Rutland's Mental Residual Functional Capacity check-off sheet is unhelpful because she fails to give any explanation for her choices. She opines, for example, that plaintiff is markedly limited in his ability to understand or remember detailed instructions, but she provides no anecdote or testing result to support her opinion and there are none in her records.  Details are similarly missing to support her opinion that plaintiff is markedly limited in his ability to perform scheduled activities, sustain an ordinary routine, adhere to basic standards of neatness and cleanliness, or be aware of hazards in the workplace.  It is permissible to reject check-off reports from physicians who do not provide any explanation of the bases for their conclusions.  Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996). Finally, it is a germane reason to disregard a lay witness' statement that the claimant is "disabled," as that is a determination left up to the Commissioner.  20 C.F.R. § 416.927 (e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").

In sum, the ALJ properly evaluated and rejected Nurse Rutland's opinion and MRFC.

III.    Whether Plaintiff Meets or Equals a Listing

Plaintiff contends he meets or equals Listing 12.04, for Affective Disorders.

The listings in Appendix I, Subpart P of part 404 of the Social Security regulations are "descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect." Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990). For a claimant to show that his impairment meets one of those listed, the impairment must meet all of the specified medical criteria. Id. at 530. Alternatively, a claimant may show that his unlisted impairment is "equivalent" to a listed impairment, but to do so he must present medical findings equal in severity to all the criteria for the one most similar listed impairment. Id. at 531. Equivalence is determined on the basis of a comparison between the "symptoms, signs and laboratory findings" about the claimant's impairment as evidenced by the medical records "with the medical criteria shown with the listed impairment." 20 C.F.R. § 404.1526. If a claimant's impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he can actually perform prior work or other work. Sullivan, 493 U.S. at 532. Plaintiff bears the burden of proving that he has an impairment that meets or equals the criteria of an impairment listed in Appendix 1 of the Commissioner's regulations. Burch v. Barnhart, 400 F.3d 676, 683 (9th Cir. 2005).

To meet or equal Listing 12.04, plaintiff must have at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation.

Page 21 - OPINION AND ORDER

Plaintiff's argument relies on his own and his mother's testimony, which he contends demonstrates that he has marked limitations in social functioning, concentration, persistence and pace, and in activities of daily living. He also relies on Nurse Rutland's MRFC, as well as notes from treatment providers at De Paul residential center which indicated plaintiff's need for 24-hour monitoring and supervision in 2004. Tr. 343. The Commissioner responds that the ALJ properly rejected plaintiff's and his mother's testimony, as well as Nurse Rutland's MRFC report, and that the report from the De Paul residential center is too old to be of value.

I have found fault with the ALJ's credibility assessment of plaintiff and his mother, but certainly the force of plaintiff's argument is much reduced since I have concluded that the ALJ properly rejected Nurse Rutland's MRFC report. I note, too, that I agree with the Commissioner that the De Paul providers' notes from 2004 fall too far beyond the relevant period. Finally, I note no psychologist or psychiatrist has opined that plaintiff's impairment meets or equals any listing.

Plaintiff also contends he had at least twelve episodes of decompensation when he was hospitalized from June 2004 to the end of 2007. In order to meet the 12.04 Listing criteria, plaintiff must have experienced at least three episodes of decompensation[3] within one year, or an average of one every four months, each lasting for at least two weeks. More frequent episodes of shorter duration may be equivalent to the weeks-long episodes required by the regulations. 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 12.00. The ALJ found only two episodes of decompensation, when plaintiff was hospitalized in July and August of 2007.

---

[3]"Episodes of decompensation" are exacerbations of or temporary increases in symptoms or signs, accompanied by a loss of adaptive functioning. 20 C.F.R. Part 404, Subpt. P., App. 1, § 12.00(c)(4).

The Commissioner argues that the relevant period begins on March 23, 2006, so plaintiff's hospitalizations before that date do not count. He also contends that the record shows plaintiff's condition improved over the years as plaintiff learned to remain sober for longer periods of time.

Pursuant to 20 C.F.R. §§ 416.202(g), 416.305, and 416.501, the relevant period begins with plaintiff's application date. While plaintiff's hospitalizations prior to March 23, 2006 are relevant to his claim for disability, as they provide a frame of reference for plaintiff's condition, he cannot meet or equal a listing for disability by counting episodes of decompensation he experienced before March 23, 2006. If these previous episodes counted towards meeting Listing 12.04, and plaintiff met the other criteria, plaintiff would, in effect, receive SSI benefits based on events that arose prior to the time he was eligible for benefits.

Accordingly, although it is unclear whether or how the ALJ's listing analysis may change with a review of plaintiff's and his mother's testimony about plaintiff's limitations, since plaintiff only experienced two episodes of decompensation during the relevant period, plaintiff failed to meet his burden of showing he should be deemed disabled pursuant to Listing 12.04.

Furthermore, plaintiff neglected to make an argument of equivalence to the ALJ. As a result, the ALJ cannot be faulted for not resolving an argument plaintiff failed to raise.

IV.    Vocational Expert Testimony

Nevertheless, since it is unclear whether the ALJ's hypothetical questions specified all of the limitations and restrictions of plaintiff, based on plaintiff's and his mother's testimony, the testimony of the vocational expert has no evidentiary value. See Edlund v. Massanari, 253 F.3d 1152, 1160 (9th Cir. 2001).

Page 23 - OPINION AND ORDER

V.    Remedy

The court has the discretion to remand the case for additional evidence and findings or to award benefits.  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).  The court should credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited.  Id.  If this test is satisfied, remand for payment of benefits is warranted regardless of whether the ALJ might have articulated a justification for rejecting the evidence.  Harman v. Apfel, 211 F.3d 1172, 1178-79 (9th Cir. 2000), cert. denied, 531 U.S. 1038 (2000).

The "crediting as true" doctrine resulting in an award of benefits is not mandatory in the Ninth Circuit, however.  Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003).  The court has the flexibility to remand to allow the ALJ to make further determinations, including reconsidering the credibility of the claimant.  Id.  On the other hand, "in the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy, even though the vocational expert did not address the precise work limitations established by the improperly discredited testimony, remand for an immediate award of benefits is appropriate."  Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004).

The ALJ erred in evaluating plaintiff and his mother's testimony.  Nevertheless, as I set forth above, there may be reasons for questioning their testimony.  Accordingly, I remand for further proceedings, which may include further hearing if deemed necessary.

## CONCLUSION

The decision of the Commissioner is reversed.  This action is remanded to the

Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the

record as explained above.  Judgment will be entered.

IT IS SO ORDERED.

Dated this _____14th_____ day of April, 2010.


   ___/s/ Garr M. King_____
   Garr M. King
   United States District Judge